UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CSX TRANSPORTATION, INC.,
    Plaintiff,

v.

JASON BLAKESLEE, ET AL.,
    Defendants.

No. 3:11-cv-533 (SRU)

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiff CSX Transportation, Inc. ("CSX") brought this diversity action seeking to "pierce the corporate veil" and collect on a default judgment for unpaid freight charges previously rendered against an entity known as the Blakeslee Group, Inc., a Connecticut corporation owned and operated by defendants Jason and Jennifer Blakeslee (the "Blakeslees" collectively, and "Jason" or "Jennifer" individually). Before the Court are cross-motions for summary judgment. The Blakeslees move for summary judgment on the veil-piercing complaint, arguing the undisputed facts reveal no basis in law or fact to hold them individually liable for the judgment (doc. # 41). Conversely, CSX cross-moves for summary judgment, arguing the Blakeslees abused the corporate form and therefore should be held liable (doc. # 42). For the reasons that follow, the defendants' motion (doc. # 41) is GRANTED, and the plaintiff's cross-motion (doc. # 42) is DENIED.

**I.    Background**[1]

This is a tale of two businesses, both owned and operated by Jason Blakeslee—or as CSX alleges, by Jason and Jennifer jointly. The first is Blakeslee Premium Pellets[2] ("Pellets"), an

---

[1] The facts are taken from the parties' Local Rule 56(a) Statements of Material Facts (docs. # 41-2 and # 42-2). The facts presented here are undisputed, unless otherwise noted.

[2] During his first deposition, Jason Blakeslee sometimes referred to this business as

unincorporated entity that sells retail wood pellets used as fuel for wood-burning stoves and furnaces throughout New England.  *See* Pl.'s Local R. 56(a) Statement (doc. # 42-2), at ¶ 10. Pellets regularly purchased wood pellets from manufacturers located in western states and shipped them to Middletown, Connecticut for sale.  *Id.* ¶ 14.  Pellet's profits were deposited into a joint checking account held in Jason and Jennifer's names.[3]  *Id.* ¶ 30.

The second business is the Blakeslee Group, Inc. ("BGI"), a Connecticut corporation that originally provided landscaping services, but in 2005 attempted (unsuccessfully) to enter into the transportation or "transloading" business.  *See* Blakeslee Dep. (12/2/2011), at 27 (A. 0068), attached as Ex. C to Pl.'s Mem. (doc. # 42-7).  Jason was the president and sole shareholder of BGI, as well as its only employee.  *See* Pl.'s Local R. 56(a) Statement, at ¶ 7.  Jennifer was the corporate secretary of BGI.  *See id.* ¶ 9.  BGI and Pellets shared common office space and a common telephone number.  *See id.* ¶ 12.[4]  However, BGI had a separate bank account (with

---

"Blakeslee Premium Sales."  *See* Blakeslee Dep. (10/6/2010), at 21 (A. 0008), attached as Ex. B. to Pl.'s Mot. for Summ. J. (doc. # 42-5).  It is unclear from the record whether this is simply a trade name or a reference to some other arm of the business.

[3] The parties dispute whether Pellets is a sole proprietorship or a general partnership.  At his deposition, Jason testified that Pellets is a sole proprietorship that he alone owns and operates.  *See* Blakeslee Dep. (12/2/2011), at 31 (A. 0069), attached as Ex. C to Pl.'s Mem. (doc. # 42-7).  However, in their Local Rule 56(a) statement, defendants stated that Pellets was a "Connecticut partnership of which Jason Blakeslee was the sole partner, and in Jason Blakeslee's name individually."  *See* Defs.' Local R. 56(a) Statement (doc. # 41-2), at ¶ 7.  But as CSX correctly points out, there is no such thing as a "sole partnership" under Connecticut law.  *See* Conn. Gen. Stat. § 34-314 (defining a partnership as "the association of *two or more persons* to carry on as co-owners a business for profit . . . .") (emphasis added).  Adding to the confusion, Jason identified Pellets as a "partnership" on his application for credit with CSX.  *See* Credit Agreement, attached as Ex. C to Pl.'s Mem. (doc. # 42-7), at A0089.  Plaintiffs argue that Jennifer was in fact a "partner" of Pellets because she had access to the joint checking account in which Pellet's profits were deposited—an account that Jennifer used to pay household bills.  *See* Pl.'s Local R. 56(a) Statement, at ¶ 30.  Defendants, however, deny that Jennifer was ever a partner in Pellets.

[4] Defendants admitted in their Local Rule 56(a) Statement that BGI and Pellets shared a

Jason listed as "joint owner"), kept minutes of annual meetings, and filed separate tax returns. *See* Defs.' Local R. 56(a) Statement (doc. # 41-2), at ¶ 5.

In June 2008, Jason contacted CSX to obtain quotes for rail transportation of wood pellets from manufacturers in Missouri and Washington to Pellet's sales office in Connecticut. *Id.* ¶ 18. Jason submitted to CSX an online application for credit. *Id.* ¶ 19. On the credit application, Jason identified Pellets as the entity responsible for the payment of CSX's freight charges.[5] *Id.* ¶ 21; *see also* CSX Transportation, Inc., Credit Agreement, attached as Ex. C to Pl.'s Mot. for Summ. J. (doc. # 42-7), at A0089. CSX approved the credit application and sent Jason an email, dated June 20, 2008, in which it confirmed the extension of credit to a company identified as "Blakeslee Premium Pellets" (i.e., Pellets). *See* Email from Ruth Salter, attached as Ex. C to Pl.'s Mot. for Summ. J. (doc. # 42-7), at A0091.

During his deposition, however, Jason told a slightly different story. At one point, Jason testified that, when he arranged for the freight transportation with CSX, he was acting on behalf of BGI.[6] *See* Blakeslee Dep. (12/2/2011), at 8-13 (A. 0063-64). However, in their Local Rule

---

common telephone number. *See* Defs.' Local R. 56(a) Statement (doc. # 47-1), at ¶ 12. However, Jason testified at his deposition that BGI and Pellets had separate phone numbers. *See* Blakeslee Dep. (12/2/11), at 7-9 (A-0068).

[5] As indicated above, Jason also identified Pellets as a "partnership" on this online application, though he testified at his deposition that this must have been a mistake. According to Jason, Pellets is a sole proprietorship.

[6] Jason also testified that he made initial contact with CSX representatives by telephone, but he could not recall whether he specifically identified BGI or Pellets as the entity requesting a shipping quote. *See* Blakeslee Dep. (12/2/2011), at 37 (A. 0070). According to Jason, the business plan was for BGI to operate as a separate entity arranging for transportation and unloading services. Pellets would be BGI's customer. At his deposition, Jason testified that, throughout the relevant period, BGI prepared invoices for the transportation services rendered on Pellets' behalf, including the rail transportation services provided by CSX. *See* Blakeslee Dep. (10/6/2010), at 29-32 (A. 0010-11); *see also* BGI Invoices, attached to Pl.'s Mot. for Summ. J., at A. 0351-376. He also testified that BGI submitted these invoices to Pellets when the wood

56(a) Statement submitted to the Court, the defendants specifically denied that Jason arranged for BGI (rather than Pellets) to be responsible for the shipping charges.[7]  For reasons that will become clear in a moment, CSX latches on to Jason's version of events, at least as recounted during his deposition, to support its veil-piercing claim.

Beginning in late July 2008 and continuing through November 2008, CSX provided rail transportation for a total of twenty-six railcars loaded with wood pellets from locations in Missouri and Washington to Connecticut.  According to the defendants, however, when the shipments arrived, most of the wood pellets were damaged and in unsalable condition.

CSX sent numerous invoices seeking payment for the freight charges.  Every one of those invoices was specifically addressed to *Pellets*, by way of Jason Blakeslee.  *See* Freight Bills and Notices, at A. 0188-0249, attached as Ex. C (part 5) to Pl.'s Mot. for Summ. J. (doc. # 42-11).  Not one invoice, bill or notice mentioned BGI as the party responsible for payment.  Pellets, in fact, paid CSX directly for the rail transportation of four of the shipments.  Pl.'s Local R. 56(a)

---

pellet shipments were delivered.  *See* Blakeslee Dep. (12/2/2011), at 15-16 (A. 0065).  However, Jason's testimony is contradicted by every other relevant document in the record.  Jason listed *Pellets* (not BGI) as the entity responsible for payment on his credit application with CSX.  *See* CSX Transportation, Inc., Credit Agreement, attached as Ex. C to Pl.'s Mem. (doc. # 42-7), at A0089.  All of CSX's invoices were addressed to *Pellets* (not BGI).  *See* Freight Bills and Notices, at A. 0188-0249, attached as Ex. C (part 5) to Pl.'s Mot. for Summ. J. (doc. # 42-11).  Further, it was *Pellets* (not BGI) that made payments directly to CSX for four of the railcar shipments.  *See* Pl.'s Local R. 56(a) Statement, at ¶ 33.  Lastly, the other vendors who provided trucking and transloading services listed *Pellets* (not BGI) on their invoices as the entity responsible for payment.  *See* Blakeslee Dep. (12/2/2011), at 66-73; 74-79 (A. 0078-81).  Thus, Jason may have originally planned for his business operations to work in the way he described, but that simply was not what transpired—at least based on the written records.

[7] *See* Defs.' Local R. 56(a) Statement, at ¶ 2 ("Jason Blakeslee denies that he actually arranged transportation for BGI through CSX or submitted an application to CSX on BGI's behalf.").

Statement, at ¶ 33.  However, CSX never received payment for the transportation of the remaining twenty-two railcar shipments.  The unpaid balance amounted to $177,533.56.

On February 18, 2009, CSX filed the underlying complaint in the United States District Court for the District of Connecticut seeking to recover the unpaid freight charges.  *See CSX Transp., Inc. v. The Blakeslee Grp.*, No. 3:09cv296 (MRK).  Curiously, CSX's complaint named *BGI* as the only defendant, despite the fact that CSX's invoices and notices of default were all addressed to Pellets.  CSX effected service on March 16, 2009, but BGI neither appeared nor took any action in the case.  On July 6, 2009, the Court entered a default judgment in the amount of $177,533.56 against BGI.  *See* Ruling and Order, attached as Ex. A to Pl.'s Mot. for Summ. J. (doc. # 42-4), at A. 0001-0002; Pl.'s Local R. 56(a) Statement, at ¶ 3.

According to CSX, the balance maintained in BGI's bank account during the relevant period never exceeded $11,286.19.  *See* Pl.'s Local R. 56(a) Statement, at ¶ 37.   In late March 2009, approximately a week after CSX served its complaint on BGI, Jason made withdrawals from BGI's bank account in the amounts of $5,745.00 and $5,190.00, which were used to pay bills and to repay an "officer loan" which he previously made to BGI.  *See* Blakeslee Dep. (10/6/2010), at 72-73 (A. 0021).  By July 1, 2009, the balance in BGI's account was $1,111.19, where it remained until February 25, 2010, when it was reduced to $0.  *See* Pl.'s Local R. 56(a) Statement, at ¶¶ 43-44.  BGI ceased all operations after 2008, and filed a final tax return (for tax year April 1, 2008 to March 31, 2009) in November 2009.  *See* Defs.' Local R. 56(a) Statement, at ¶ 10.  Needless to say, CSX soon realized that it had obtained an uncollectable judgment against BGI and began searching for alternative means to collect.

On April 6, 2011, CSX filed the instant lawsuit.  *See* Compl. (doc. # 1).  The original complaint named Jason, Jennifer, and Pellets as defendants and asserted two claims for relief:

(1) failure to pay rail common carrier freight charges governed by 49 U.S.C. § 11101; and (2) breach of contract. *Id.* CSX later filed an amended complaint, which dropped the breach of contract claims completely, removed Pellets as a party (thereby naming only Jason and Jennifer Blakeslee as defendants), and asserted only one cause of action: fraud. *See* Am. Compl. (doc. # 11). The fraud allegations were sparse, and the defendants responded with a motion for more definite statement (doc. # 12). Treating the motion as a motion to dismiss for failure to state a claim under Federal Rules of Civil Procedure 9(b) and 12(b)(6), I granted the defendants' motion without prejudice in a written order dated October 3, 2011. *See* Ruling and Order (doc. # 24).

On October 12, 2011, CSX filed a second amended complaint, naming Jason and Jennifer Blakeslee as defendants, and asserting two causes of action: (1) fraudulent misrepresentation; and (2) piercing the corporate veil. *See* Second Am. Compl. (doc. # 25). Thereafter, on November 23, 2011, CSX filed its third amended complaint (the final iteration), naming Jason and Jennifer Blakeslee as defendants, but asserting only one cause of action: piercing the corporate veil. *See* Third Am. Compl. (doc. # 37-1). It is to the third amended complaint that the instant cross-motions for summary judgment are directed.

On June 6, 2012, a hearing was held on the cross-motions. At that point in time, I indicated to the parties that the plaintiff's veil-piercing complaint was unlikely to succeed given that the credit application and invoices were all directed to Pellets, rather than BGI. Moreover, I explained that, regardless of the merits of the claim, it would be circuitous at best to pierce BGI's corporate veil to reach parties who are potentially primarily liable in their individual capacities. Thus, in an effort to streamline the case, I reserved a ruling on the cross-motions for summary

judgment and granted CSX the option to amend its complaint to assert a direct cause of action against Pellets and the Blakeslees.[8]

CSX did not to heed my advice—at least not directly. In a letter dated June 18, 2012, CSX informed me that it did not wish to amend its complaint (doc. # 51). Instead, CSX filed a separate action against Pellets and the Blakeslees in the United States District Court for the Middle District of Florida (the "Florida Action") seeking to recover the very same unpaid freight charges. *See CSX Transp., Inc. v. Blakeslee, et al.*, No. 3:12-cv-713 (MMH-TEM). Weeks later, on July 16, 2012, CSX filed a motion to stay this case, informing this Court (for the first time) of the existence of the newly-filed Florida Action and arguing that "judicial economy" warranted deferring this case until after the Florida Action was resolved. *See* Pl.'s Motion for Stay (doc. # 56), at 2. Because summary judgment provides a far more "economic" means to dispose of meritless claims, I denied the motion to stay (doc. # 61) and now turn to address the pending cross-motions.

## II.  Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

---

[8] On June 25, 2012, the Blakeslees filed a motion for leave to amend their pleading to assert a set-off defense against CSX based on the damage to the wood pellets that allegedly occurred during shipment. *See* Mot. for Leave to Amend (doc. # 54), at 1. I granted the motion on August 3, 2012 (doc. # 62). To the extent the Blakeslees' amended pleading asserts a set-off or recoupment claim against CSX, that defensive claim does not survive entry of summary judgment in favor of the defendants on the plaintiff's underlying veil-piercing complaint. *See United States v. New Hill Homes Assocs., Ltd. P'ship*, 2000 WL 306623, at *4 (D. Conn. Feb. 29, 2000) (stating that a recoupment claim is "purely defensive, used to diminish or defeat the plaintiff's cause, but not as the basis for an affirmative recovery") (quoting *Genovese v. J.N. Clapp Co., Inc.*, 4 Conn. App. 443, 495 (1985)). To the extent the Blakeslees are asserting a counterclaim for the damaged goods, the counterclaim survives independently. However, unlike a recoupment claim, an independent counterclaim is subject to the applicable statute of limitations.

R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d. 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party").  When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992).  If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted.  *Anderson*, 477 U.S. at 249-50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247-48.  To present a "genuine" issue of material fact, there must be contradictory

evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

**III.    Discussion**

I begin with the basic standards for piercing the corporate veil under Connecticut law. Ordinarily, an order piercing the corporate veil is an equitable determination allowing for the enforcement of a judgment against a party not primarily liable. *See Macomber v. Travelers Property & Cas. Corp.*, 261 Conn. 620, 623 n.3 (2002). In Connecticut, the concept of piercing the corporate veil is not itself treated as an independent cause of action. *See Intermed, Inc. v. Alphamedica, Inc.,* 2009 WL 5184195, at *8 (D. Conn. Dec. 21, 2009); *cf. Naples v. Keystone Bldg.*, 295 Conn. 214 (2010); *Angelo Tomasso, Inc. v. Armor Const. & Paving, Inc.*, 187 Conn. 544, 555 (1982). However, Connecticut courts have permitted veil-piercing claims to proceed in order to collect on a previous underlying default judgment against a corporate entity. *See Davenport v. Quinn*, 53 Conn. App. 282, 299 (1999) ("[Plaintiff] brought suit claiming that the defendants were essentially alter egos of Pub, Inc., and under the theory of piercing the corporate veil he is entitled to satisfaction of the underlying judgment.").

In general, courts employ two basic rules when considering whether to pierce the corporate veil:  the instrumentality rule or the identity rule. "The instrumentality rule requires, in any case but an express agency, proof of three elements: (1) [c]ontrol, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [the] plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." *Comm'r of Envtl. Prot. v. State Five Indus. Park, Inc.*, 304 Conn. 128, 137 n.11 (2012) (internal quotation omitted).  The alternative (and often interchangeable) identity rule has been stated as follows: "If [the] plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise." *Id.* (internal quotation omitted).  However, as the Connecticut Supreme Court has observed:

> [o]rdinarily the corporate veil is pierced only under exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice . . . . Unless something of the kind is proven, however, to do so is to act in opposition to the public policy of the state as expressed in legislation concerning the formation and regulation of corporations. . . . *[C]ourts decline to pierce the veil of even the closest corporations in the absence of proof that failure to do so will perpetrate a fraud or other injustice.*

*Naples*, 295 Conn. at 233-34 (emphasis added).

Here, CSX argues the corporate veil should be lifted to hold the Blakeslees individually liable for the judgment entered against BGI.  Specifically, CSX contends that the Blakeslees are liable for the judgment under both the instrumentality and the identity rule.  With regard to the instrumentality rule, CSX argues:  (1) that the Blakeslees exercised complete control over BGI such that BGI had "no separate mind, will or existence of its own" (an allegation the Blakeslees do not contest); (2) that BGI was inadequately capitalized as evidenced by the fact that its account never held more than $12,000 during the relevant period in which it allegedly racked up over $175,000 in freight charges; (3) that Pellets and BGI were indistinguishable as separate business entities as evidenced by the fact that they shared an office address, telephone number, and that Pellets paid some of BGI's alleged freight charges directly to CSX; and (4) that this domination and control caused BGI to breach its contract with CSX, proximately causing CSX's damages.  *See* Pl.'s Mem. (doc. # 42-1), at 6-12.  Similarly, with regard to the identity rule, CSX argues that BGI had no separate corporate existence apart from Jason and Jennifer Blakeslee (and, by extension, Pellets), and therefore the Blakeslees should be held personally liable for the judgment rendered against BGI.  *See id.* at 16-21.

However, both arguments collapse if, as the record reveals, the shipping contract was not between CSX and BGI, but between CSX and *Pellets*.  Even if the Blakeslees did ignore formalities and abuse the corporate form, a piercing claim does not lie unless that abuse proximately caused CSX's losses.  That causal connection is absent here.

Although, as CSX points out, Jason stated during his deposition that he was acting on behalf of BGI when he sought out CSX's services, that statement is belied by every other document in the record.  In fact, the evidence submitted by both parties demonstrates conclusively that CSX entered into a credit arrangement with Pellets—not BGI—for the

shipments at issue.9  Jason listed *Pellets* (not BGI) as the entity responsible for payment on his credit application with CSX.  *See* CSX Transportation, Inc., Credit Agreement, attached as Ex. C to Pl.'s Mem. (doc. # 42-7), at A0089.  CSX later confirmed in writing that it was extending credit to *Pellets* (not BGI).  *See* Email from Ruth Salter, attached as Ex. C to Pl.'s Mot. for Summ. J. (doc. # 42-7), at A0091.  All of CSX's invoices were addressed to *Pellets* (not BGI). *See* Freight Bills and Notices, attached as Ex. C (part 5) to Pl's Mot. for Summ. J. (doc. # 42-11), at A. 0188-0249.  Further, it was *Pellets* (not BGI) that made payments directly to CSX for four of the railcar shipments.  *See* Pl.'s Local R. 56(a) Statement, at ¶ 33.  None of the documents exchanged between the parties—neither the credit application nor any of the dozens of bills and notices—ever mentioned BGI.  Based on the record before me, there is no evidence that the Blakeslees utilized BGI to work any type of fraud or injustice against CSX.  On the contrary, rather than shroud itself behind a corporate veil, Pellets (and Jason himself) assumed direct responsibility for CSX's freight charges.  Accordingly, there is no basis to disregard BGI's separate corporate existence, and the Blakeslees are entitled to summary judgment on the plaintiff's veil-piercing complaint.

Despite reams of paper submitted in support of these motions, the fact of the matter is that CSX simply sued the wrong entity in the underlying action.  Under the circumstances, the most sensible (and cost-effective) approach would be for CSX to amend its complaint to assert a

---

9 To the extent CSX relies on the default judgment entered in its favor in *CSX Transp., Inc. v. The Blakeslee Grp.*, No. 3:09cv296 (MRK), to establish that BGI contracted for the freight transportation at issue, that reliance is misplaced.  As a general rule, factual determinations from a prior default judgment have no collateral estoppel effect because the issues were not "actually litigated."  *See Gambino v. Am. Guarantee & Liability Ins. Co.*, 2009 WL 3158151, at *4 (D. Conn. Sept. 28, 2009) ("An issue is 'actually litigated if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined,'" but where "there was litigation by default, it is not litigation that can be characterized having been in fact determined.") (quoting *Dowling v. Finley Assoc., Inc.*, 248 Conn. 364, 373-74 (1999)).

claim directly against Pellets, an unincorporated entity for which its proprietors are apparently individually responsible. CSX chose not to take that route, despite ample opportunity to do so. Instead, CSX decided to start from scratch by filing a new lawsuit against Pellets and the Blakeslees in a distant forum. I need not pass on the wisdom or propriety of that decision, but only on the merits of the claim left before me. Because CSX has failed to come forward with any evidence that the Blakeslees used BGI to defraud, the veil-piercing claim fails as a matter of law.

## IV.  Conclusion

The defendants' motion for summary judgment (doc. # 41) is GRANTED, and the plaintiff's cross-motion for summary judgment (doc. # 42) is DENIED.

It is so ordered.

Dated at Bridgeport, Connecticut, this 11th day of September 2012.

                                                           /s/ Stefan R. Underhill
                                                          Stefan R. Underhill
                                                          United States District Judge